Good morning, Your Honors. I'm Charles Nicola Perin for the petitioner, Edgardo Catimbang. The issue in this case is whether the facts compel a finding that Mr. Catimbang has met his burden of establishing that he suffered persecution in the Philippines or faces a well-founded fear of future persecution in the Philippines on account of his expressed political opinion or on account of an imputed political opinion. There are a couple of cases from this court which would indicate that he has met that burden, in particular Borjas v. INS and Garavillas v. INS. In this case, Mr. Catimbang was an employee of the Philippine government. He worked for the Department of Agrarian Reform. He was a clerk who kept track of land titles. His supervisor, Mr. Lorenzo, did field inspections of government projects. And on May 5, 1992, he was accompanying Mr. Lorenzo. They encountered armed men who were conducting an illegal logging operation on government lands. This is sort of like the prior case. We've got these criminals who supposedly have some political affiliation. Well, in this case, there's certainly a lot of evidence that this was the NPA. But they killed him. This is the question I had before in the other case. Let me ask you this. Is it just because once a political organization, in the course of carrying out criminal activity to finance their activities, takes adverse action, in this case killing the supervisor, is that enough then to convert their action into political activity? Or is it simply criminal activity to further a political aim, but it's not directed at the victim himself because of his politics? Well, in this case, they weren't just extorting the – I mean, it wasn't just a matter of extortion, you know, for financial gain. They killed the supervisor because he had seen their illegal activity. Exactly. He was a witness. He was a witness. Right. And he's part of the government. And he's opposed to their – In fact, he's part of the government. This case is substantially different from the Briones case, which I remember well because I wrote the opinion. In that case, it was an informer against the NPA, and it was uniquely political. Here there was this logging business that was involved, and that seems to have been the reason why people were getting in trouble with the NPA. It was a question of logging in the Briones case. Well, in this case, the – I mean, there were a number of factors. He had seen that he was working for the government in opposition, doing inspections and going into an area where they were operating. And that – you know, in the Borjas case, you know, the fact that she said that she was pro-government. I wrote in the Borjas case, too. This is different from the Borjas case. And it gave enough of an indication that that was a political opinion that she told them directly. In a face-to-face confrontation? In a face-to-face confrontation. Here, this individual is not just pro-government. He's employed by the government. It's a statement that he's working for the government. And they came and saw him in a face-to-face confrontation, and they said, You join us, and you don't tell what's going on, or else we'll kill you. We'll do the same we did to Mr. Lorenzo. Such as threatened recruitment? Threatened recruitment and the fact that he's with the government. I mean, in the Borja case, Teresita Borja didn't do a whole lot more than say, you know, I'm pro-government, and I think what you do is repugnant. And in this case, this individual is a member of the government, and he's actually going out in the field and taking action against them by inspecting those areas where they're active. And they see him as a threat to their domination over that region and their activities. And as far as evidence that it's the NPA, you know, on page 96 of the record, they tried to recruit his younger brother, and there was no question that it was the NPA in that part. The board's decision on this is really strange in some of their criticisms. They say that we didn't find that it was persecution because the threats were not pervasive and long-lasting, as they had been in some other cases. But in a situation like this where, you know, he has a confrontation with the NPA out in the field, two days later, on May 6th, 1992, his boss is killed. On May 7th, 1992, his boss is killed. The next day, they come to his home. You know, the fact that the threats were not long-lasting, I think is ‑‑ if they were long-lasting, I think it would lessen their severity because if a death threat is credible and action is taken quickly, then it would seem that it was more of a credible threat. He ‑‑ and he acted quickly, and he left the country. As far as his ability to identify these as NPA, I don't see why the ‑‑ this Court has held in other cases, in Bolanos Hernandez, it said that persecutors are hardly likely to leave a calling card or give affidavits as to the atrocities or threats that they commit. And when we have the State Department report talking about the NPA, the way they act, the way they extort, and the way they engage in extrajudicial killings, we have certainly that in this case. We have a person who works for the government, not as an informer, not as an informer, but as someone who was going out and taking action against the NPA by, you know, working with agrarian reform, going into areas where they operated, and working with the government to try to stop their operation. When they tried to recruit him, what did he tell them as to his reason for not going along with them? He said, I have to think. He didn't say it was because I was pro‑government or anything like that, correct? No, he didn't say that. But there could also be an imputed political opinion in this case by the fact that he was with the government. As far as, you know, in Borja, she said, I'm pro‑government. This man, by his employment, would indicate that he's pro‑government. And so you're saying just the employment's enough? The employment and the nature of it as well, the fact that he was actually going out into their areas and affecting their operation. Well, but, you know, in that sense, he's just engaging in law enforcement, in effect. So he's carrying out his ‑‑ We talked about Briones. That was law enforcement where the person was an informer. We'll have to parse that, too. I'm just trying to understand what your argument is. So you're saying as long as it's a government worker, and he goes out and he's interfering with criminal activity, in this case illegal logging, and then they come to his door and say, as he acknowledged, at least certainly he understood it, that they didn't want him to interfere any further in their logging activities or tell anybody. Right. That's political? Yes. Okay. Yes, I believe that. Necessarily. Necessarily? Yes, that would be. And certainly, you know, the political involvement, if you look at Borja, I would think that there's a stronger indication in the present case as far as the political component, as far as working for the government than simply saying, you know, I happen to favor the government. It would be like someone saying I favor the war in Iraq as opposed to someone who enlists in the Army and goes and fights. We've got your point. We'll hear from the other side. Okay. Thank you. I just want to reserve my remaining time. Sure. Good morning, Your Honors. May it please the Court. Paul Clement for the Respondent. Your Honors, I think what this case boils down to is effectively an effort at forced recruitment, perhaps coupled with an effort at witness tampering. But neither of those constitute persecution on account of political beliefs. We know from the ---- Add into that that they killed the boss. They did kill the boss, and that may make it an extreme incident of witness tampering. But that doesn't make it persecution on account of a political belief. And if you break it down into its two components, you have the forced recruitment, which we know from Elias Zacharias does not constitute persecution on account of political belief. And as this Court has noted on occasions such as the Sangha case by Judge Goodwin, indeed forced recruitment itself is a little bit at odds with the idea that you've singled somebody out because of their adverse political views, because generally you wouldn't think an organization like the MPA wants to fill its ranks with people who disagree with him. How does this case differ from Boraho? Well, I think it differs in critical respect from Bora, Judge Trott. I mean, though ultimately you'd be in a better position to judge that, because in Bora, when she's confronted in the forced recruitment effort, she then makes it clear that she disagrees with them and doesn't want to join them because of her political opposition to them. And then as this Court goes on to emphasize, it's that statement of political opposition that really takes it out of the standard forced recruitment case and draws a clear nexus between what's going on and the persecution that follows, including the physical injuries and abuse, and that statement of political opposition. And again, this Court not only focused on that statement of political opposition as the key to distinguishing Elias Zacharias, but also noted that that statement gave the case the unmistakability of a dinosaur in a haystack. And in this case, without that statement, there simply is no dinosaur in the haystack. And indeed, the more obvious inference here is, as Judge Fisher was suggesting in questions both in this case and the previous case, is that you have an effort at witness tampering. The individuals here were not singled out. And I agree that they were — what happened to Mr. Lorenzo, if the testimony is credited, is very severe. But what happened to him was not because of his political opinion, but because he witnessed a crime. And I think when an organization like the NPA engages in what is effectively witness tampering, they're not singling out the people for their political opinion. They're singling them out because of their status as a witness to a potential criminal activity. And how does Brionis work, then, in your view? Well, I think Brionis is distinguishable predominantly based on the sort of — first of all, you have the severity of the threats there, which are sort of ongoing and repeated. But principally there, as this Court made clear, there was no doubt that Brionis was somebody who was singled out by the NPA for political opposition. He was a confidential government informant. His information had led to the capture of a major NPA leader. And I guess most obviously, Brionis was an individual who was on the NPA's death list. And, I mean, maybe the easiest way to point it out is that Brionis is distinguishable because the NPA was in no means interested in recruiting Mr. Brionis. They were interested in killing Mr. Brionis. And there's just no similar information in this record that suggests that they're singling out the Petitioner here for his political beliefs or his role in helping the government deal with the NPA on a broad scale. Like, as I say, the one thing that seems to stand out here is he's been singled out because he's witnessed this event and this crime. Why isn't it — explore a little more why, as is argued, isn't the fact that the person that they're tampering with, as you put it, intimidating and essentially trying to convert to their side a government employee, why doesn't that inject the political component? Well, I think I have two answers to that, Judge Fischer. First, I think just as a matter of pure logic, he is — their efforts directed at him are not directed at him because he's a government employee. They are focused on him because he's a witness to a crime who happens to be a government employee. But I would think if you had a situation where there was a legal logging operation going on and the NPA was generating revenue through that, and just an ordinary civilian stumbled upon it, you might have exactly the same kind of witness tampering effort, and it really would just happenstance that the individual had to be a government employment. Now, that's, as I say, sort of a common-sense answer to your question. On a more doctrinal level — A little more, because in this case, he's just not a witness. He's also an enforcer. In other words, they want not only him to shut up about what went on in the past, they want him not to exercise his government function in the future. I think that's right. I mean, I think we could quibble about exactly what his role is, and I think that as the way the immigration judge saw it, his role was actually pretty ministerial. But even if you assume he had sort of more of a real law enforcement role, I think that just suggests that there's one less link in the chain that's involved in the witness tampering. I mean, because ordinarily you try to intimidate somebody not to go to the police with the idea that that's where you're going to stop the prosecution taking place. Obviously, if the witness is a police officer, you can sort of kill two birds with one stone, so to speak, and go right to the law enforcement officer and try to intimidate the law enforcement officer. And I think that's just a difference of methodology, and it may sort of change the way that the NPA would react in the two cases slightly. But again, it's not that he's a government employee that is the reason they're trying to go after him, certainly not because of his political views either. If they're going after him for any reason, it's because of his role in the system. But he could be sort of pro-NPA, pro-government, really doesn't matter. It's his role in the system that's critical. And as I said, there's sort of a doctrinal component to that answer as well, because this court, in a case that's not cited in the briefs, but it's Cruz-Navarro against Immigration and Nationalization Service, and it's a 232 F. 3rd, 1024, in an opinion by Judge Tashima, made clear that the fact that that case involved alleged persecution against a national police officer and the national police of Peru involving an alleged persecution by the Sendero Luminoso, and what the court there held is the simple fact that this individual was a government employee, a law enforcement officer, was not enough to find or to compel the conclusion that there was an imputed political opinion to that individual just because of his service in the government. And I think if that's true with respect to somebody like the individual there who's a member of the Peruvian National Police, I think it's true a forciore for the Department, which I think is probably less definitively associated with the views of the government and pro-government beliefs than a national police unit. So in the end, I would simply say, I mean, certainly there are other ways to look at this case, but I think at bottom, the problem with this case from the petitioner's standpoint is that the evidence in the record certainly supports the idea that what's is a persecution on account of a political belief. Another case of this Court that I think isn't ---- If you're going to kill an individual if they don't join up, don't you have a case of political opinion? No, I don't think so, because I think that question actually takes you back to Eli Zacharias, where the Supreme Court said that even a pro-NPA person, if you put it in these terms, might have reasons not to want to join up. And so as the Court in Eli Zacharias said, people may have many reasons not to want to join up with an organization in a forced recruitment situation. And so the fact that they don't join up and the fact that they may be retaliated against for not joining up doesn't make them somebody who's been retaliated on for a political belief. We don't care about their reason. We care about the reason that the NPA imputes to them. Isn't that the ---- is the rationale? Well, I mean, I think that certainly one does, but I think one still, as Eli Zacharias suggests, I mean, when you look at somebody who is retaliated against or persecuted against because they resist a forced recruitment effort, it is least as plausible an inference that the reason that they are going to go against him is not because of a political view, but they're going to go against him just to make good on their threat, to try to in future cases have a reputation as somebody who when they say you better join up or die, they mean it. But as Eli Zacharias makes clear, that doesn't convert it into persecution on account of political activity. On another question, is this a transitional case? I don't know the answer to that. You should. Yes, I should. I'm sorry I don't. But let me ---- I think whether it's a transitional case or not, the one thing that's clear is it is a case that does not turn on that status, but turns on the fact that you have an individual ---- I asked that question because of the voluntary departure question. Well, there is voluntary departure that's granted in this case. Yes. So, I mean, the voluntary departure, if the board's decision is affirmed, voluntary departure will take place. That's a little simplistic answer, because number one, did they ask for a stay? Was it granted? Yes, stay was granted. Okay. Now we need to know whether it's transitional or permanent rules that apply, because there could be different time frames. Okay. Well, I'll send a letter to the court and provide that information. Okay. I'm sorry I don't have it at my fingertips. Okay. If there are no further questions. Thank you, counsel. Just briefly, it was pointed out that when Teresita Borjas was confronted by the NPA and they wanted to recruit her, she spoke out against them, said I'm not in favor and I don't support the kinds of things you do. One important difference, Mr. Kottenbaum did not do that. He just said I'll think about it. But there's an important difference. The previous day his supervisor had been shot. I mean, that's an experience that certainly Ms. Borjas didn't have. So the level of threat that Mr. Kottenbaum was facing and what had been realized as far as the ability and the incentive of the NPA to commit atrocities against his supervisor and perhaps against himself was quite more elevated than what Ms. Borjas was facing. An underlying problem that I have with your case is that it appears to me that your client's testimony simply was not credited by the IJ. The IJ found it not to be believable. For those reasons, which I'm sure you've read many times, I have discounted the Respondent's testimony. I have not found him credible or worthy of belief. Yeah, on very minor points. In fact, the Board did not. Minor points? The Board did not find that. Or I would find he failed to establish past persecution on account of one of the grounds. And he points out earlier the Respondent's testimony is based on what he's presented to the court in his short declaration. There's no claim regarding his affiliation with the agrarian reform movement or the agriculture department on his original applications, the Exhibit 2, or on his biographical information form. In fact, in neither of those places does it appear that he was ever employed by any government agency. Then he goes on here and then he says, I don't believe this. I've discounted his testimony. Yeah, I've seen the application containing the record. It was filled out by a consultant. It's in handwriting. And we don't know. The judge says she doesn't know what was stated at the asylum office. And, you know, he basically gave his testimony. His testimony was not inconsistent. The problem with the application was it didn't say very much. It said very little. It said see attached declaration. And what there was no real declaration of any use. I mean. There's an adverse credibility finding. Wrong? Yes. And the board was. No, there's not. Because the decision we have is the Board of Immigration Appeals. They did a de novo review. And under Garland v. S., the review of this Court is limited to the board's finding, unless to the extent that they refer specifically to the findings of the immigration judge. But if the judge was fine in the sense that the money failed to establish that he was persecuted in the past in the Philippines, that doesn't. Well, they don't make an adverse credibility finding. They just simply say that the facts as stated would be taken as credible, that he doesn't qualify for asylum. But that finding is certainly contrary to many of the decisions that have been issued by this Court and that we've discussed. The judge noted certain things that he would say we would go out into the field. And she said, oh, well, didn't you just go one time? What he was referring to, we, he was referring to his organization, the Department of Agrarian Reform. And he clarified that in the record. The adverse credibility finding, if it were before the Court, which I don't think that it is, but if it were before, if the board had affirmed that, I don't think that case, that finding could have withstood scrutiny before this Court. Under cases such as Aguilar-Acota, Martinez-Sanchez, Delorio-Lopez, there's not a sufficient basis for finding that the petitioner in this case was not a credible witness. Let me ask you about voluntary departure. Do you know whether this is a transitional case? He would be entitled to voluntary departure because, yes. I understand he is entitled to voluntary departure. Right. But the terms of it may be an issue as to what timing he gets, depending upon whether it's transitional or permanent rules. Do you know whether it's a transitional case? It's a transitional case. It is transitional? Yes. Because he would be, he asked for a stay of voluntary departure at the time that he, that the petition for review was filed. The petition for review was filed before Zazueta came out on March 15th of 2003. That stay is still in place. Right. Yeah. And so then we had El Jimre came out September 19th, and then, so, yeah, he would, if the Court were to deny the case, as I understand, he would have 52 days from the date of the decision. He would be 52 days until the issuance of the mandate. All right.  All right. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you both counsel. Court is in recess until tomorrow morning. Thank you. Thank you. Thank you.
judges: B. Fletcher,trott, Fisher